## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNIÓN FENOSA GAS, S.A.,<br><br>               Plaintiff,<br><br>    - and -<br><br>ARAB REPUBLIC OF EGYPT; THE BANK OF NEW YORK MELLON CORPORATION; AND THE BANK OF NEW YORK MELLON SA/NV, LUXEMBOURG BRANCH,<br><br>               Defendants. | **20 CV 9160**<br><br>Civ. No. 20-_____<br><br>**COMPLAINT** |

Plaintiff Unión Fenosa Gas, S.A. ("UFG" or "Plaintiff"), by and through its undersigned counsel, alleges as follows for its Complaint against Defendants the Arab Republic of Egypt ("Egypt"), The Bank of New York Mellon Corporation ("BNYM"), and The Bank of New York Mellon SA/NV, Luxembourg Branch ("BNYM Luxembourg" and, together with BNYM, "BNY Mellon"):

## INTRODUCTION

1. This is an action to invalidate, at least as to UFG, Egypt's fraudulent agreement purporting to transfer funds into a trust, with BNY Mellon serving as the purported trustee, for the sole purpose of shielding those funds from attachment by UFG, which holds a judgment against Egypt for over US$ 2 billion.

2. On April 29, 2010, Egypt and BNY Mellon entered into a "Fiscal Agency Agreement" governing, *inter alia*, the payment of principal and interest on two series of Egypt's sovereign bonds: US$ 1 billion of 5.75% Notes due 2020 (the "2020 Notes") and US$ 500 million of 6.875% Notes due 2040 (the "2040 Notes" and, together with the 2020 Notes, the

"Notes"). BNYM, acting through its offices in London and New York, serves as the principal paying agent and the New York paying agent on the Notes, and BNYM Luxembourg serves as the Luxembourg paying agent. What this means, in short, is that BNY Mellon receives funds from Egypt and uses them to make payments of principal and interest to the holders of the Notes (the "Noteholders").

3.      Section 9(b) of the Fiscal Agency Agreement, as originally agreed by Egypt and BNY Mellon, provided that each of the paying agents: ███████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████ █████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████  This liability was an attachable asset of Egypt that could be extinguished only by (i) BNY Mellon's payment of the principal and interest due on the Notes to the Noteholders or (ii) BNY Mellon's repayment to Egypt of all funds remaining unclaimed at the end of two years after the due date for the payment of the principal and interest.

4.      On June 23, 2020, this Court ordered BNYM to produce to UFG all agreements governing the "handling and respective legal interests" in the funds used by BNY Mellon to make debt service payments on the Notes. Only three days after the Court's order, Egypt and BNY Mellon entered into a "First Supplemental Agency Agreement" purporting to amend the

Fiscal Agency Agreement. Under the purported amendment, the sums received by BNY Mellon from Egypt to make the debt service payments on the Notes ███████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████. As a result, they would no longer be attachable by UFG during the period between BNY Mellon's receipt of the funds from Egypt and its payment of the funds to the Noteholders (or its repayment of the funds to Egypt, to the extent they remained unclaimed at the end of two years).

5.     The First Supplemental Agency Agreement is voidable as to UFG under Section 273(a)(1) of New York's Uniform Voidable Transactions Act. The timing and the content of the Agreement indisputably establish that Egypt and BNY Mellon entered into it for the sole purpose of hindering, delaying and defrauding UFG. The Agreement bears several badges of fraud, including that: (i) when Egypt entered into the Agreement, it owed UFG more than US$ 2 billion under an arbitral award and an English court judgment recognizing the award; (ii) Egypt and BNY Mellon entered into the Agreement only three days after this Court ordered BNYM to produce the Fiscal Agency Agreement to UFG; and (iii) Egypt did not receive any consideration (much less reasonably equivalent value) from BNY Mellon or the bondholders in return for agreeing to create the purported trust and to transfer funds into it.

6.     The trust that Egypt purported to create under the First Supplemental Agency Agreement also is void as against UFG under Section 7-3.1(a) of New York's Estates, Powers and Trusts Law, which invalidates trusts created "for the use of the creator." Egypt, not any of the bondholders, was the intended beneficiary of the trust, which Egypt created solely for the purpose of shielding its funds from attachment by its multi-billion dollar judgment creditor, UFG. In addition, Egypt impermissibly reserved for itself all surplus funds remaining in the

"trust" after BNY Mellon's payment of the principal and interest due on the bonds to the bondholders.

7.     Remarkably, BNY Mellon itself appears to have been aware of the invalidity of the First Supplemental Agency Agreement under New York law at the time when it signed the Agreement. As set forth more fully below, Section 7 of the Agreement explicitly provides that, *inter alia*: ███████████████████████████████████████

███████████████████████████████████████
███████████████████████████████████████
████████████████████████████

8.     UFG seeks an order (i) avoiding the First Supplemental Agency Agreement, (ii) awarding money damages in favor of UFG and against Egypt and BNY Mellon in the amount of all funds paid by BNY Mellon to the bondholders since the date of the First Supplemental Agency Agreement, (iii) declaring that the trust that Egypt purported to create under the First Supplemental Agency Agreement is void as against UFG; and (iv) granting UFG such other and further relief as is just.

## THE PARTIES

9.     Plaintiff UFG is a corporation organized under the laws of Spain, with headquarters located at Parque Empresarial Alvento, Vía de la Poblados, 1, 28033, Madrid, Spain.

10.     Defendant Egypt is a foreign state within the meaning of the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1330, 1332, 1391(f), 1441(d), 1602–1611.

11.     Defendant BNYM is a Delaware corporation having its principal executive office in this District.

12.     Defendant BNYM Luxembourg is a corporation organized under the laws of Luxembourg, with headquarters located at 2-4 rue Eugene Ruppert, Vertigo Building – Polaris, L-2453 Luxembourg, Luxembourg. BNYM Luxembourg is a wholly-owned indirect subsidiary of BNYM.

13.     Egypt, BNYM and BNYM Luxembourg are collectively referred to as the "Defendants."

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1330(a).

15.     Egypt is a "foreign state" as defined under 28 U.S.C. § 1603.

16.     Egypt is not immune from the subject matter jurisdiction of this Court because this action is based upon (i) Egypt's commercial activity in the United States; (ii) Egypt's performance, directly and through its duly-designated and authorized agents, of at least one act in the United States in connection with commercial activity elsewhere; and/or (iii) Egypt's performance, directly and through its duly-designated and authorized agents, of an act or acts committed outside the United States in connection with its commercial activity elsewhere, which act(s) caused a direct effect in the United States. Egypt also is not immune from the subject matter jurisdiction of this Court because ███████████████████████████████ ███████████████████████████████. Because Egypt is not entitled to immunity under the FSIA, the Court has subject matter jurisdiction over this entire case pursuant to 28 U.S.C. § 1330(a).

17.     Personal jurisdiction over Egypt is conferred by 28 U.S.C. § 1330(b). The Court will obtain personal jurisdiction over Egypt pursuant to 28 U.S.C. § 1330(b) upon the completion

of service of process pursuant to 28 U.S.C. § 1608, as no minimum contacts are required in connection with the establishment of personal jurisdiction over a foreign state.

18.     Personal jurisdiction in this Court is proper over BNYM, which has its principal place of business in this District.

19.     Personal jurisdiction in this Court is proper over BNYM Luxembourg, because: (i) this action arises out of and in connection with the First Supplemental Agency Agreement, and ███████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████ ;  (ii) ███████████████████████████

███████████████████████████████████████████████████████

███████████████████████ ; and (iii) this action is based upon BNYM Luxembourg's commercial activity in New York.

20.     Venue is proper in this Court under 28 U.S.C. § 1391(b) and (f). BNYM has its principal place of business in this District. The actions referenced herein occurred, in whole or in part, in this District.

## FACTS

### A.      UFG IS A JUDGMENT CREDITOR OF EGYPT

21.     On August 31, 2018, a tribunal constituted under the Agreement on the Reciprocal Promotion and Protection of Investments between the Kingdom of Spain and the Arab Republic of Egypt (the "Treaty") and the Convention on the Settlement of Investment Disputes between States and Nationals of Other States (the "ICSID Convention") issued an arbitral award (the "Award") in favor of UFG and against Egypt in the amount of US$ 2.013

- 6 -

billion (plus interest and costs). The Award relates to Egypt's impairment of UFG's investments in Egypt, which the arbitral tribunal found constituted a breach of the Treaty.

22.     On November 19, 2018, UFG commenced proceedings before the Commercial Court, Queen's Bench Division of the Courts of England and Wales (the "English Court") to enforce the Award in England (the "English Proceedings").

23.     On December 19, 2018, the English Court issued an order registering the Award and giving it the force of an English court judgment (the "English Recognition Order"). Having sought and obtained the English Recognition Order in its favor, UFG qualifies as a judgment creditor of Egypt.

24.     On January 8, 2019, Egypt filed an application with the International Centre for Settlement of Investment Disputes ("ICSID") to set aside the Award.

25.     On October 18, 2019, the ICSID Annulment Committee, an ad hoc tribunal convened to consider Egypt's application to set aside the Award, entered a stay of enforcement of the Award, conditional on Egypt's posting of security. On January 24, 2020, the Annulment Committee lifted the stay because Egypt had failed to post the required security.

26.     Egypt has not sought to stay enforcement of the Award in England, and no basis exists under English law for the English Court to grant such a stay in view of the ICSID Annulment Committee's decision lifting its stay of enforcement. The Award thus remains fully enforceable in England, with the force of an English court judgment, pursuant to the English Recognition Order.[1]

---

[1]     On June 30, 2020, the English Court issued a judgment denying Egypt's application to set aside three orders that it had issued with respect to the procedure for registering the Award in England. On July 3, 2020, the English Court issued a judgment denying Egypt's request for

27.     To date, Egypt has not satisfied the Award. The total amount owed under the Award as of the date hereof, including pre-award interest and post-award interest, is US\$ 3,908,651,433.

**B.     EGYPT'S OUTSTANDING BONDS AND THE FISCAL AGENCY AGREEMENT**

28.     On April 26, 2010, Egypt filed a prospectus with the Luxembourg Stock Exchange ("Prospectus") relating to its issuance of the 2020 Notes and the 2040 Notes. According to the Prospectus, Egypt is required to make semi-annual interest payments on the Notes every April 30 and October 30 until maturity. The Prospectus stated that the 2020 Notes and the 2040 Notes would mature on April 29, 2020 and April 30, 2040, respectively.

29.     On April 29, 2010, Egypt (as Issuer) entered into the Fiscal Agency Agreement with BNYM acting through its office in London (as fiscal agent and principal paying agent), BNYM acting though its office in New York (as New York paying agent and registrar), and The Bank of New York Mellon (Luxembourg) S.A. (as Luxembourg paying agent, transfer agent and registrar) with respect to the 2020 Notes and the 2040 Notes.[2]

30.     The Fiscal Agency Agreement governs (*inter alia*) the payment of principal and interest on the Notes. Notably, Section 4(a) of the Fiscal Agency Agreement provides that ███

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

---

permission to appeal its June 30, 2020 judgment and requiring Egypt to pay UFG's costs on an "indemnity" basis (*i.e.*, giving UFG the benefit of any doubt as to whether the costs were reasonably incurred or whether they were reasonable in amount). On July 6, 2020, the English Court issued an order consequent to its June 30, 2020 and July 3, 2020 judgments. On August 27, 2020, Egypt withdrew its application to the English Court of Appeal requesting permission to appeal the judgments.

[2]     On April 1, 2018, The Bank of New York Mellon (Luxembourg) S.A. was merged into BNYM Luxembourg.

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████

31.   Section 9(b) of the Fiscal Agency Agreement is entitled ████████ As originally agreed in 2010, Section 9(b) provided that each of the paying agents under the Agreement (*i.e.*, BNYM acting through its office in New York, BNYM acting through its office in London, and BNYM Luxembourg): ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████

32.   ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████ This liability could be extinguished only by (i) BNY Mellon's payment of the principal and interest due on the Notes to the Noteholders or (ii) BNY Mellon's repayment to Egypt of all funds remaining unclaimed at the end of two years after the due date for the payment of the principal and interest due on the Notes.

33.   Section 12(b) of the Fiscal Agency Agreement sets out the conditions under which the Agreement may be amended. It provides, *inter alia*, that ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████

34.   Section 14(a) of the Fiscal Agency Agreement provides that ██████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████

## C.   UFG OBTAINS DISCOVERY FROM BNYM IN AID OF THE ENGLISH PROCEEDINGS

35.   On March 26, 2020, UFG filed an *ex parte* petition in this District to take discovery from BNYM pursuant to 28 U.S.C. § 1782 in aid of the English Proceedings (the "1782 Petition").

36.   UFG explained in the 1782 Petition that, according to the Prospectus for the Notes, Egypt would make redemption payments to the holders of the 2020 Notes on April 29, 2020. In addition, semi-annual interest payments on the 2040 Notes would be due every April 30 and October 30 until maturity.

37.     UFG stated in the 1782 Petition that, to satisfy Egypt's outstanding debt under the Award, it intended to make an application in the English Proceedings to execute funds belonging to Egypt that would be used to service and/or redeem the Notes. UFG explained that, according to the Prospectus: (1) BNYM's branches in New York and London serve as fiscal agents in connection with the Notes; (2) BNYM's New York branch serves as the registrar for the Notes; and (3) payments to the Noteholders are likely distributed through BNYM's London branch, which serves as principal paying agent for the Notes. UFG further explained that, because of BNYM's roles as fiscal agent, registrar and principal paying agent for the Notes, it was "likely to have critical documents and information pertaining to the amounts to be disbursed by Egypt, the sources of such funds, Egypt's ownership and possessory interests in those funds, the manner in which the bonds are serviced, and the roles of the various payment agents at each step of the payment process."

38.     UFG requested an order authorizing the issuance of a subpoena *duces tecum* (the "Document Subpoena") and a subpoena *ad testificandum* (the "Deposition Subpoena" and, together with the Document Subpoena, the "Subpoenas") to BNYM.

39.     On April 8, 2020, Judge P. Kevin Castel of this District granted the 1782 Petition on an *ex parte* basis and authorized UFG to issue the Subpoenas to BNYM. Egypt subsequently moved to quash or modify the Subpoenas.

**D.     THE COURT DENIES EGYPT'S MOTION TO QUASH THE DOCUMENT SUBPOENA ISSUED TO BNYM**

40.     On June 23, 2020, Judge Castel issued an Opinion and Order denying Egypt's motion to quash the Document Subpoena, modifying the Document Subpoena and quashing the Deposition Subpoena. Judge Castel concluded that BNYM was obligated to produce to UFG (i) "'agreements governing the handling and respective legal interests in [the] funds' that 'will be

used by the paying agent to make debt service payments on the bonds'" (alterations in original) and (ii) "documents identifying those financial institutions through which 'Egypt's funds will need to flow to or through . . . at any particular juncture' in order to make coupon and/or redemption payments on the notes" (alteration in original).

**E.     THREE DAYS AFTER THE COURT'S ORDER, EGYPT AND BNY MELLON PURPORT TO AMEND THE FISCAL AGENCY AGREEMENT IN AN ATTEMPT TO SHIELD EGYPT'S FUNDS FROM ATTACHMENT BY UFG**

41.     On July 15, 2020, BNYM produced two documents responsive to the Document Subpoena: the Fiscal Agency Agreement and the First Supplemental Agency Agreement.

42.     On June 26, 2020, more than 10 years after Egypt and BNY Mellon had entered into the Fiscal Agency Agreement but only **three days** after Judge Castel denied Egypt's motion to quash the Document Subpoena, Egypt and BNY Mellon entered into the First Supplemental Agency Agreement, which purported to amend Section 9(b) of the Fiscal Agency Agreement. Specifically, ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████

43.     Egypt and BNY Mellon did not obtain the Noteholders' approval for this amendment to the Fiscal Agency Agreement. As set out in the following paragraph, the text of the First Supplemental Agency Agreement itself establishes that: ███████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ██████████████████████

44.     The recitals of the First Supplemental Agency Agreement state that: ███

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███ [3] Section 7 of the First Supplemental Agency Agreement, entitled ███

███ provides in pertinent part as follows:

████████████████████████████████████████

45.     The First Supplemental Agency Agreement did not amend any section of the Fiscal Agency Agreement other than Section 9(b). Section 3(a) of the First Supplemental Agency Agreement provides that ████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

---

[3]     The term "Agents" is defined in the First Supplemental Agency Agreement as ███

███████████████████

███████████████████████ Section 4 of the First Supplemental Agency Agreement provides that ███████████████████████████████████████████████████

46.   Through the First Supplemental Agency Agreement, Egypt and BNY Mellon purported to eliminate Egypt's ownership interest in the funds during the period between BNY Mellon's receipt of the funds from Egypt and its payment of the funds to the Noteholders. ██

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████

47.   It is plain from the timing and the content of the First Supplemental Agency Agreement that Egypt and BNY Mellon entered into this Agreement for the sole purpose of shielding the funds held by BNY Mellon under the Fiscal Agency Agreement from attachment by UFG. As explained above, only three days before Egypt and BNY Mellon entered into the First Supplemental Agency Agreement, Judge Castel had issued an order denying Egypt's motion to quash the Document Subpoena and directing BNYM to produce to UFG all agreements governing the "handling and respective legal interests" in the funds used by BNY Mellon to make debt service payments on the Notes. Faced with the imminent reality that BNYM would have to produce the Fiscal Agency Agreement to UFG, and the consequent risk that UFG would attach the funds received by BNY Mellon from Egypt under the Agreement,

Egypt and BNY Mellon amended the Fiscal Agency Agreement in an attempt to shield the funds from attachment by UFG and to hinder, delay and defraud UFG.

## FIRST CAUSE OF ACTION
### Voidable Transaction (Actual Fraud)

48.     UFG repeats and realleges the allegations in paragraphs 1 through 47 as if set forth fully herein.

49.     Section 273(a)(1) of New York's Uniform Voidable Transactions Act, Article 10 of the New York Debtor and Creditor Law, provides that "[a] transfer made or obligation incurred by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation with actual intent to hinder, delay or defraud any creditor of the debtor." N.Y. Debt. & Cred. Law § 273(a)(1).

50.     This cause of action arises under New York law because: (i) the transaction that UFG seeks to avoid by means of this cause of action – the First Supplemental Agency Agreement between Egypt and BNY Mellon – is governed by New York law; and (ii) most of the acts and events giving rise to this cause of action occurred in New York, the principal place of business of BNYM.

51.     UFG has been a creditor of Egypt under the Award since August 31, 2018, and it has been a creditor of Egypt under the English Recognition Order since December 19, 2018.

52.     BNY Mellon has served as the paying agent with respect to the Notes since Egypt and BNY Mellon entered into the Fiscal Agency Agreement on April 29, 2010. At twice-yearly intervals, BNY Mellon receives funds from Egypt for payment of the principal and interest due on the Notes to the Noteholders. The 2040 Notes will mature on April 30, 2040.

53.     Under Section 9(b) of the Fiscal Agency Agreement as originally agreed in 2010, Egypt had an ownership interest in these funds during the period between BNY Mellon's receipt of the funds from Egypt and its payment of the funds to the Noteholders. ███████████

████████████████████████████████████████████████████

████████████████████████ This liability could be extinguished only by (i) BNY Mellon's payment of the principal and interest due on the Notes to the Noteholders or (ii) BNY Mellon's repayment to Egypt of all funds remaining unclaimed at the end of two years after the due date for the payment of principal and interest.

54.     On June 26, 2020, only three days after Judge Castel denied Egypt's motion to quash the Document Subpoena issued to BNYM, Egypt and BNY Mellon entered into the First Supplemental Agency Agreement in an attempt to shield these funds from attachment by UFG. Section 2(a) of the First Supplemental Agency Agreement purported to amend Section 9(b) of the Fiscal Agency Agreement, ███████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████. As a result, these funds would no longer be attachable by UFG during the period between BNY Mellon's receipt of the funds from Egypt and its payment of the funds to the Noteholders.

55.     The timing and the content of the First Supplemental Agency Agreement indisputably establish that Egypt and BNY Mellon entered into this Agreement for the sole purpose of hindering, delaying and defrauding UFG, to which Egypt owed more than US$ 2 billion. Egypt and BNY Mellon's amendment of Section 9(b) of the Fiscal Agency Agreement by means of the First Supplemental Agency Agreement has several badges of fraud:

a.  Before incurring the obligation under the First Supplemental Agency Agreement to create a trust and to transfer funds into the trust at twice-yearly intervals, Egypt had been ordered to pay UFG more than US$ 2 billion under the Award and the English Recognition Order.

b.  In moving to quash the Subpoenas issued to BNYM, Egypt sought to conceal from UFG the agreements governing its ownership interest in the funds used by BNY Mellon to pay the principal and interest due on the Notes to the Noteholders.

c.  Egypt and BNY Mellon entered into the First Supplemental Agency Agreement only three days after Judge Castel issued an order denying Egypt's motion to quash the Document Subpoena and directing BNYM to produce to UFG all agreements governing the "handling and respective legal interests" in the funds used by BNY Mellon to make debt service payments on the Notes.

d.  The effect of the First Supplemental Agency Agreement (if valid) would be to eliminate Egypt's ownership interest in the funds used by BNY Mellon to pay the principal and interest due on the Notes to the Noteholders, thereby shielding the funds from attachment by UFG.

e.  BNY Mellon did not provide any consideration (much less reasonably equivalent value) to Egypt in exchange for the obligation incurred by Egypt under the First Supplemental Agency Agreement to create a trust, purportedly for the benefit of the Noteholders, and to transfer funds into the trust at twice-yearly intervals.

*See* N.Y. Debt. & Cred. Law § 273(b).

56.     BNY Mellon entered into the First Supplemental Agency Agreement in bad faith, because: (i) it was aware that the sole purpose of the Agreement was to eliminate Egypt's ownership interest in the funds used by BNY Mellon to pay the principal and interest due on the Notes, thereby shielding the funds from attachment by UFG; (ii) it was aware that the Agreement did not comply with the conditions for a valid amendment of the Fiscal Agency Agreement set out in Section 12(b) of that Agreement;[4] and (iii) it did not provide any consideration (much less reasonably equivalent value) to Egypt under the First Supplemental Agency Agreement.[5] For these reasons, BNY Mellon explicitly stated in Section 7 of the First Supplemental Agency Agreement that ████████████████████████████████████████████████████████████

████████████████

57.     UFG is entitled to the relief specified in the Uniform Voidable Transactions Act, *see* N.Y. Debt. & Cred. Law §§ 276-277, in particular an order (i) avoiding the First Supplemental Agency Agreement, (ii) entering a money judgment in favor of UFG and against Egypt and BNY Mellon in the amount of all funds paid by BNY Mellon to the Noteholders since the date of the First Supplemental Agency Agreement, and (iii) granting any other relief the circumstances may require.

---

[4]   As explained above, ████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

[5]   The absence of any consideration is confirmed by ████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

58.     The First Supplemental Agency Agreement is voidable against BNY Mellon under Section 277(a) of New York's Uniform Voidable Transactions Act because, as discussed above, BNY Mellon: (i) did not enter into the Agreement in good faith; and (ii) did not provide any consideration (much less reasonably equivalent value) to Egypt under the Agreement. *See* N.Y. Debt. & Cred. Law § 277(a).

### SECOND CAUSE OF ACTION
**Trust Void as Against UFG**

59.     UFG repeats and realleges the allegations in paragraphs 1 through 58 as if set forth fully herein.

60.     Section 7-3.1(a) of New York's Estates, Powers and Trusts Law provides that "[a] disposition in trust for the use of the creator is void as against the existing or subsequent creditors of the creator." N.Y. Est. Powers & Trusts Law § 7-3.1(a).

61.     This cause of action arises under New York law because: (i) the trust that UFG seeks to avoid by means of this cause of action is governed by New York law ███████████ ████████████████████████████████████████████████████████████████ ████████; and (ii) most of the acts and events giving rise to this cause of action occurred in New York, the principal place of business of BNYM.

62.     Section 2(a) of the First Supplemental Agency Agreement purports to ████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████████████████  ██████████████████████████████████ ████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████ .

63.     The trust that Egypt purported to create under Section 2(a) of the First Supplemental Agency Agreement is void as against UFG under Section 7-3.1(a) of New York's Estates, Powers and Trusts Law because: (i) when Egypt agreed to create the trust, it was a debtor of UFG under the Award and the English Recognition Order; (ii) Egypt, not any of the Noteholders, was the intended beneficiary of the trust, which Egypt created solely for the purpose of shielding its funds from attachment by UFG; (iii) Egypt did not receive any consideration from BNY Mellon or the Noteholders in return for agreeing to create the trust and to transfer funds into the trust, purportedly for the benefit of the Noteholders; and (iv) Egypt reserved for itself all surplus funds remaining after BNY Mellon's payment of the principal and interest due on the Notes to the Noteholders.

64.     UFG is entitled under Section 7-3.1(a) of New York's Estates, Powers and Trusts Law to a declaration that the trust that Egypt purported to create under Section 2(a) of the First Supplemental Agency Agreement is void as against UFG.

## CONCLUSION

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment against Defendants as follows:

(a)     Avoiding the First Supplemental Agency Agreement;

(b)     Awarding money damages in favor of UFG and against Egypt and BNY Mellon in the amount of all funds paid by BNY Mellon to the Noteholders since the date of the First Supplemental Agency Agreement;

(c)     Declaring that the trust that Egypt purported to create under Section 2(a) of the

First Supplemental Agency Agreement is void as against UFG;

(d)     Awarding pre-judgment interest to UFG; and

(e)     Granting such other and further relief to UFG as is just.

Dated: New York, New York
       November 2, 2020

Respectfully submitted,

James E. Berger
Thomas C.C. Childs
Charlene C. Sun

KING & SPALDING LLP
1185 Avenue of the Americas
New York, NY 10036
(212) 556-2202
jberger@kslaw.com
tchilds@kslaw.com
csun@kslaw.com